Affirmed and Memorandum Opinion filed August 1, 2006








Affirmed and Memorandum Opinion filed August 1, 2006.

 

 

 

 

In The

 

Fourteenth Court of
Appeals

____________

 

NO. 14-04-00270-CV

____________

 

PURNELL FURNITURE SERVICES, INC., Appellant

 

V.

 

WAREHOUSE RACK COMPANY, Appellee

 



 

On Appeal from the 295th
District Court

Harris County, Texas

Trial Court Cause No. 2002-30460

 



 

M E M O R A N D U M   O P I N I O N








Appellee, Warehouse Rack Company (AWRC@), sued appellant,
Purnell Furniture Services, Inc. (APurnell@) for breach of
contract.  Purnell counterclaimed alleging violations of the Deceptive Trade
Practices Act (ADTPA@).  A jury awarded
WRC damages, but awarded Purnell no damages on its counterclaim.  Appellant
raises four issues on appeal: (1) the evidence was legally and factually
insufficient to support the judgment in favor of WRC because Purnell performed
the contract or, alternatively, was excused from performance; (2) the trial
court reversibly erred by refusing to give a limiting instruction to the jury
regarding a witness=s compliance under the Texas Engineering
Practices Act (ATEPA@); (3) the trial
court erred when it entered the jury=s award for
extra-contractual damages; and (4) the evidence was legally and factually
insufficient to support the award of attorney=s fees.  We
affirm.

Factual and Procedural Background

WRC specializes in buying and selling warehouse equipment. 
Purnell specializes in warehousing and shipping furniture for various national
retailers, and, in order to better serve its customers, Purnell constructed a
new warehouse in Suwannee, Georgia.  Purnell contracted with WRC to purchase
used furniture cantilever rack from a warehouse in Athens, Texas.  WRC was to
purchase the rack, ship it to Suwannee, modify the rack to suit Purnell=s needs, and then
install it in January, 2002.  

Purnell provided the dimensions of the warehouse and
specifications for the rack.  Utilizing those dimensions, WRC hired Rick
Denmark in September, 2001 to provide drawings of proposed rack layouts.  The
original dimensions provided by Purnell did not include certain aspects of the
warehouse, as Denmark discovered in November or December, 2001 when he received
an AutoCAD drawing of the warehouse.  The AutoCAD drawing showed that a wall
was not positioned as originally understood, and there was a work area within
the warehouse.  Denmark and Neil Camberg, WRC=s president,
discussed the variances with Purnell.  All agreed that the best solution would
be to move the work areaCa solution Purnell said would be no
problem, as the warehouse was a work in progress.  

On January 4, 2002Cthree days before
installation was supposed to beginCPurnell informed
WRC that a permit was necessary.  WRC immediately began the process of
obtaining a permit, including hiring Grayson Willard, a Georgia registered
professional engineer.  Despite beginning the permitting process in January,
the permit was not approved until March, 2002.  As a result, the installation
was delayed until March 8.  








WRC hired Don Russell to modify and install the rack. 
Russell agreed to travel to Georgia in January for ten or twelve days.  He was
to meet the trucks carrying the rack in Georgia, unload the trucks, and begin
working.  However, two issues prevented the plan from being carried out. 
First, the building contractor was preparing to pour the parking lot and would
not allow the trucks on the surface.[1] 
Second, the necessary permit had not been obtained and, as a result, the
building contractor would not allow the installation to begin.[2] 
Although installation could not begin, Russell and Camberg testified that it
was necessary for Russell and his crew to make the trip to Georgia to meet the
trucksCwhich had already
left Texas when the permitting issue was first raised.  Russell unloaded the
trucks at an off-site location, and then returned to Texas with his crew.

The lack of permit caused further problems.[3] 
Specifically, after the first trip to Georgia, Camberg instructed Russell to
communicate directly with Purnell and return to Georgia when Purnell asked him
to return.  Believing the permit was imminent on three other occasions, Elmer
Purnell instructed Russell to return to Georgia three other times, though
Russell was not able to install the rack because the permit had not issued. 
Russell complained to Camberg of the added expense of the trips.  Camberg
agreed that Russell should recover the additional $13,697 in expenses for the
four additional trips and orally guaranteed he would pay those expenses.  








In March, when the permit was finally approved, WRC and
Purnell again discussed the terms of their agreement.  Camberg was concerned
that Purnell would not pay the remaining contract installment.  There was one
remaining truckload of materials to deliver to Georgia and WRC refused to ship
those materials until Purnell signed a letter reaffirming all original termsCexcept for the
datesCof the original
agreement.  The letter made no mention of the additional trip expenses for
Russell.  However, in a telephone conversation, Camberg told Richard Purnell
that he would not invoice those extra expenses if Purnell would sign the letter
and pay according to its terms.  Richard Purnell signed and returned the
letter.

Russell returned to Georgia with his crew in MarchChis fifth tripCand completed
installation on March 23.  Yet not even installation went according to plan. 
When Russell and his crew began installation, they learned that the work area
had not been moved as Purnell had agreed to do.  Despite the apparent problem,
Russell testified that he was able to install all of the rack as provided in the
AutoCAD drawings.  However, Elmer Purnell directed Russell to remove 600 feet
of rack.  Russell offered to reinstall the rack at a different location in the
warehouse, but Elmer Purnell refused.  Having made the modifications to Purnell=s satisfaction,
Russell placed the unused rack outside of the warehouse and returned to Texas.








WRC expected its final payment from Purnell within seven
days of installation.  In April, 2002, WRC attempted to contact Purnell
regarding payment as WRC had not received the final installment.  Purnell
responded that it was measuring the installed rack and would remit payment once
the measurements were complete.  Eventually, Purnell sent a final payment to
WRC, but reduced the contractual amount by $6,612 (760 feet of uninstalled rack
multiplied by $8.70/ft installation cost).[4] 
WRC then hired an attorney and filed suit for breach of contract alleging that
Purnell breached by not paying the contract amount, and by causing additional
travel expenses by not having the warehouse ready for installation as agreed. 
Purnell counterclaimed alleging WRC violated the DTPA.

A jury awarded damages to WRC on its claims, and no damages
to Purnell on its claims.  Purnell filed a motion for new trial, which was
overruled by operation of law.  Purnell then timely filed notice of appeal.

Analysis

I.        The
Evidence was Sufficient to Support the Jury=s Findings

In its first issue, Purnell contends the evidence was both
legally and factually insufficient to support the jury=s findings that
Purnell breached the contract, or, alternatively, that the evidence
conclusively established that Purnell=s failure to
comply was excused.  As part of its issue, Purnell argues that the jury
implicitly and improperly found for WRC on a theory of Asubstantial
performance,@ even though substantial performance had not been pled
or tried by consent as a theory of recovery.  However, as we explain, the
evidence was sufficient to support the finding that Purnell failed to comply
with its agreement, and the evidence was sufficient to support the finding that
Purnell was not excused from performance.

A.      Legal
Sufficiency

1.       WRC=s Claim








When conducting a legal sufficiency review, we must view
the evidence in the light most favorable to the verdict.  City of Keller v.
Wilson, 168 S.W.3d 802, 807 (Tex. 2005).  WRC provided evidence that it had
performed the contract fully.  Russell testified that he actually installed all
of the contracted-for rack before Purnell required that he deviate from the
plans and remove some of the rackCan additional
service not provided for in the contract.[5] 
That Purnell instructed some rack to be removed was undisputed at trial.  Also
undisputed was that Russell offered to install the removed rack elsewhereCadditional work
not provided for in the contractCbut Purnell
refused this additional service.  Viewed in the light most favorable to the
verdict, WRC met and exceeded its obligations under the contract.[6] 
It not only installed all of the contracted-for rack, but also performed
additional labor by then removing some of the installed rack.  Thus, the only
remaining dispute is whether the evidence conclusively established that Purnell=s failure to
comply with the agreement was excused.

2.       Purnell=s Affirmative
Defenses








Taking a different tack, Purnell contends that it was
excused from performing its obligation to pay under the contract.  Waiver and
excuse are affirmative defenses.  See Tex. R. Civ. P. 94; CDS Enters.,
Inc. v. Myrad Real Estate, Inc., 14-97-00197-CV, 1999 WL 548226, at *4B5 (Tex. App.CHouston [14th
Dist.] July 29, 1999, no pet.) (not designated for publication).  As such,
Purnell bore the burden of proof at trial.  A party bringing a legal
sufficiency challenge to an adverse finding on an issue on which she had the
burden of proof must demonstrate on appeal that the evidence establishes, as a
matter of law, all vital facts in support of the issue.  Dow Chem. Co. v.
Francis, 46 S.W.3d 237, 241 (Tex. 2001) (per curiam).  We must examine
first the record for evidence supporting the finding while ignoring all
contrary evidence.  Id.  If there is no evidence to support the finding,
then we will examine the entire record to determine if the contrary proposition
is established as a matter of law.  Id.  We will not reverse unless the
contrary proposition is conclusively established.  Id.  Purnell cannot
meet this burden.

Purnell=s theory of excuse and waiver relied
entirely on the lack of finally installed rack.  Yet it ignored at trial, and
continues to ignore on appeal, the contrary evidence that it was responsible
for the lack of installed rack.  As we outlined above, the jury heard testimony
that all contracted-for rack was installed.  The jury also heard testimony that
Purnell was the reason less rack remained installed due to its onsite changes
to the layout.  Viewed in the light most favorable to the verdict, we cannot
say that anything less than all of the contracted-for rack was installed. 
After installation, some of the rack was removed at Purnell=s instruction. 
The evidence supports the jury=s finding that Purnell=s failure to
comply with the agreement was not excused.  

B.      Factual
Sufficiency

1.       WRC=s Claim

Purnell also raises a factual sufficiency challenge.  In
evaluating a factual sufficiency  challenge, we will set the verdict aside only
if it is so contrary to the overwhelming weight and preponderance of the
evidence that it is clearly wrong and manifestly unjust.  Arrellano v. State
Farm Fire and Cas. Co., CS.W.3dC, 2006 WL 909931,
at *2 (Tex. App.CHouston [14th Dist.] 2006, no pet.).  We
will review all of the evidence in the record, both supporting and contrary to
the finding.  Id.  Of course, in conducting our review, we may not
merely substitute our judgment for that of the jury.  Golden Eagle Archery,
Inc. v. Jackson, 116 S.W.3d 757, 761 (Tex. 2003).








We have already discussed the evidence supporting the jury=s findings.  The
only contrary evidence that WRC did not install all of the contracted-for rack
came from Purnell=s sole witness, David Jester, Purnell=s Vice-President
of Operations.  Jester=s testimony simply relayed that 760 feet
of rack were behind Purnell=s warehouse following installation.  He
never disputed that 6,720 feet of rack were actually installed, as required
under the contract.  Neither did he dispute testimony that Elmer Purnell
explicitly directed Russell to remove rack.  He did not even testify that
Purnell or he measured the amount of rack actually installed in the warehouse. 


The jury heard testimony that WRC and Russell had performed
fully under the contract; indeed, Russell=s testimony
indicated he had provided service beyond contractual obligations.  In essence,
it was a credibility determination for the jury to make: was Russell accurate
in his testimony that the contract had been performed fully, or was Jester
accurate that the contract was not performed fully.  The evidence was not
complicated and merely required the jury to resolve conflicts in testimony. 
The jury resolved this conflict and we will not disturb its finding when there
is sufficient evidence to support it, as here. 

2.       Purnell=s Affirmative
Defenses

When a party had the burden of proof at trial on an issue,
and raises a factual sufficiency challenge to an adverse finding on that issue,
we must consider and weigh all of the evidence.  Dow Chem. Co., 46
S.W.3d at 242.  We will set the verdict aside only if the evidence is so weak
or if the finding is so against the great weight and preponderance of the
evidence that it is clearly wrong and unjust.  Id.  As always, we may
not merely substitute our judgment for that of the jury.  Golden Eagle
Archery, 116 S.W.3d at 761.  

Purnell=s defense was simply that it had no
obligation to pay for rack that was not installed and it could not use.  There
was ample evidence that WRC installed all of the contracted-for rack.  The
undisputed testimony was that Purnell expressly demanded that installed rack be
removed.  The evidence was factually sufficient to support the jury=s verdict in this
regard and we will not set it aside.

 








C.      Summary

The evidence was both legally and factually sufficient to
support the jury=s verdict.  Thus, we overrule appellant=s first issue.

II.       Trial
Court Did Not Err in Refusing to Give the Jury a Limiting Instruction

In its second issue, Purnell argues the trial court erred
in not giving the jury a limiting instruction pursuant to Texas Rule of
Evidence 105 regarding Denmark=s legal ability to
hold himself out as an engineer.  We review evidentiary rulings for abuse of
discretion.  Horizon/CMS Healthcare Corp. v. Auld, 34 S.W.3d 887, 906
(Tex. 2000).  We will not reverse unless the trial court=s rulingCif erroneousCprobably caused
the rendition of an improper judgment.  Id.  Thus, we must first
determine if the trial court=s refusal to give the limiting instruction
was error.  If the trial court did not err, then we need not conduct a harm
analysis.  

TEPA requires that a person not practice engineering or
hold himself out as an engineer in Texas if he is not licensed and registered
as an engineer by the State.  Tex. Occ.
Code ' 1001.301.  Purnell argues that Denmark violated the
statute because he affirmatively represented himself at trial as an engineer,
able to perform engineering.  Additionally, Purnell states that WRC misled
Purnell by referring to Denmark as an engineer.  Purnell misstates the record. 









At trial, Denmark was clear in stating that while he holds
an engineering degree from a preeminent educational institution, Texas A&M
University, he is not a licensed engineer.  Additionally, Denmark testified
that he had merely provided AutoCAD drafting services, which do not require an
engineering license.  Finally, Denmark had not been held out to Purnell as a
licensed engineer.  Thus, there was no testimony or evidence requiring a
limiting instruction.  We hold that the trial court did not err in refusing a
limiting instruction to the jury and overrule Purnell=s second issue.[7]

III.      Trial
Court Properly Awarded Consequential Damages

WRC pleaded two breaches of contract.  The first was that
it was not paid as required under the contract.  The second was that Purnell
did not have the warehouse ready for installation and therefore caused WRC to
incur additional installation expenses in the amount of $13,697 for the four
extra trips to Georgia.  The jury ultimately awarded WRC $6,848.50, half of the
consequential damages it sought.  Purnell contends this claim is nothing more
than a pass-through claim, and was improper as a matter of law because WRC was
not liable to its subcontractor, Russell.  WRC counters that the claim is WRC=s claim for
additional expenses it incurred.  As a result, WRC argues, it is not a
pass-through claim.  We agree with WRC.








Texas first recognized pass-through claims in 2004.  See
Interstate Contracting Corp. v. City of Dallas, 135 S.W.3d 605, 607 (Tex.
2004) (answering certified questions from the United States Circuit Court for
the Fifth Circuit).  A pass-through claim is a claim (1) by a party who has
suffered damages (typically, a subcontractor), (2) against a responsible party
with whom it has no contract (typically, the owner of property), and (3)
presented through an intervening party who has a contractual relationship with
both (typically, the contractor).  See id. at 610.  Pass-through
litigation allows for the efficient resolution of disputes because any
settlement by the owner is a full and final settlement because the
subcontractor promises to release the contractor from liability to the extent
the contractor presents the subcontractor=s claim and
renders any recovery to the subcontractor.  Id. at 616.  Pass-through
litigation thus prevents the situation where multiple suits are needed to
finalize one claim.  This case does not satisfy the requirements for a
pass-through claim.

The jury heard ample evidence that WRC was liable to its
subcontractor for the full $13,697.  It also heard evidence that WRC=s liability to the
subcontractor was not contingent upon a favorable ruling in the underlying
case.  These facts clearly remove this case from the realm of pass-through
claims as WRC brought its own claim for damages, not Russell=s.  Purnell has
never argued that it should not be liable for extra-contractual damages for
which the jury believed it was liable to WRC; Purnell has argued only that WRC
was not liable to Russell.  However, the evidence was undisputed that WRC was
obligated to Russell for $13,697 in additional travel expenses.  The evidence
established, and the jury found, that Purnell was partly at fault for the
additional expenses incurred in the four extra trips to Georgia.  Therefore,
the jury awarded WRC relief for half of the additional travel expenses.  The
trial court did not err in entering the judgment on the jury=s verdict.  We
overrule Purnell=s third issue.

IV.      There Was
Sufficient Evidence on the Issue of Attorney=s Fees

In its final issue, Purnell argues the evidence presented
regarding attorney=s fees was both legally and factually
insufficient.  Purnell=s argument concerns WRC=s failure to
segregate fees among the claims.  See Stewart Title Guar. Co. v. Sterling,
822 S.W.2d 1, 10B11 (Tex. 1991).  Purnell has not argued
that the evidence presented was incompetent or that the fees were excessive or
otherwise were unreasonable under the Arthur Andersen factors.  See
generally, Arthur Andersen & Co. v. Perry Equip. Corp., 945
S.W.2d 812, 818 (Tex. 1997).  Purnell simply argues that because fees were not
segregated, they were waived; also, because Purnell believes the judgment for
actual damages was error, it argues WRC should not recover its fees on those
claims.  We disagree.








There were two experts presented at trial regarding
attorney=s feesCone expert for
WRC, and one for Purnell.  Both experts testified that the fees could not be
segregated.  One of those experts was Curt Langley, Purnell=s counsel on
appeal.  Therefore, it is not only the case that the evidence was sufficient,
but also that it was undisputed and affirmatively presented by both parties
that the fees could not be segregated.  Additionally, because we have found no
error with regard to the actual damages, WRC was entitled to recover attorney=s fees.  We
overrule Purnell=s final issue.

Conclusion

Having overruled each of Purnell=s issues, we
affirm the judgment of the trial court.

 

 

/s/      Margaret Garner Mirabal

Senior Justice

 

 

Judgment rendered
and Memorandum Opinion filed August 1, 2006.

Panel consists of
Justices Hudson, and Senior Justices Mirabal and Amidei.[8]









[1]  Purnell points out that Russell and the trucks were
two days late arriving in Georgia.  Had they arrived on January 7, Purnell
argues, they could have unloaded the materials in the warehouse because the
parking lot was not under construction at that time.  However, that argument
ignores the second issue that prevented unloading and installation at the
warehouse.





[2]  There is also a dispute as to whether or not rack
installation requires a permit, or if a permit is necessary only to use rack. 
Regardless, the evidence indicated the building contractor believed a permit
was necessary for installation, and would not allow installation to begin
without a permit.  The building contractor also informed Russell that the
inspector would shut down all construction were he to find that they were
installing rack without the appropriate permit.





[3]  WRC claimed that its problems in receiving the
permit timely were a result of the permitting authority not providing specific
enough information on how to obtain a permit.  WRC made more than one attempt
to receive the permit because its initial application failed.





[4]  Both parties disputed how much rack had been finally
installed.  WRC provided evidence that 600 feet of rack had been removed at
Elmer Purnell=s request, which accounted for any rack shortage. 
Purnell argued that 760 feet of rack had not been installed.  Purnell computed
the amount of missing rack by measuring the unused rack sitting outside of its
warehouse.  However, WRC provided evidence showing that methodology would not
be accurate because it had purchased and shipped extra rack in the event it was
needed.  Therefore, according to WRC, its methodology of computing the missing
rackCby taking measurements of removed rack within the
warehouseCwas accurate.  As we explain below, the jury resolved
this conflict in favor of WRC.





[5]  Purnell argues that because Russell believed he removed only 600 feet
of rack, and because Purnell measured 760 feet of rack sitting behind its
warehouse, 160 feet of contracted-for rack was never installed.  However, that
ignores evidence that WRC shipped extra rack to the work site.  It also ignores
Purnell=s sole witness=s testimony that Purnell never
undertook a measurement of the rack installed, only a measurement of rack sitting
outside of its warehouse. 





[6]  Additionally, Purnell does not argue that the rack
was installed in an unworkmanlike manner, or otherwise installed in an
unsatisfactory manner.  Neither did Purnell argue WRC and Russell failed to
perform under the contract to deliver, receive, and customize the rack
according to the contract specifications.  Its argument is merely that it has
less rack installed than provided for in the contract.





[7]  We also note that the only harm Purnell attributes
to this alleged error concerns Denmark=s
credibility before the jury, and Purnell=s
belief it did not receive professional engineering services as the contract
required.  Yet, Purnell cross-examined Denmark extensively regarding his lack
of an engineering license.  Also, the evidence was undisputed that WRC hired a
professional engineer to certify and stamp the plans as required under Georgia
law.    





[8]  Senior Justices Margaret Mirabal and Maurice Amidei
sitting by assignment.